# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PATRICK SWENIE, ) | |
| ) | |
| Plaintiff, ) | No. 17-cv-1010 |
| ) | |
| v. ) | Magistrate Judge Susan E. Cox |
| ) | |
| VILLAGE OF MAYWOOD, VILLAGE OF ) | |
| MAYWOOD DEPARTMENT OF ) | |
| ADMINISTRATIVE HEARINGS, ) | |
| MAYWOOD ORDINANCE ENFORCEMENT ) | |
| DEPARTMENT, MAYWOOD ) | |
| DEPARTMENT OF COMMUNITY ) | |
| DEVELOPMENT, HEARING OFFICER ) | |
| PAMELA HARRIS, MAYWOOD CHIEF OF ) | |
| POLICE VALDIMIR TALLEY, POLICE ) | |
| COMMANDER THEODORE YANCY, and ) | |
| POLICE SERGEANT DARYL FAIRLY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons discussed herein, Plaintiff's Motion for Summary Judgment (dkt. 78) is granted in part and denied in part as follow: 1) DENIED as to Count I against Yancy and Talley to the extent Count I concerns the investigative *Terry* stop of Plaintiff; 2) DENIED as to Count I against Yancy for false arrest; 3) GRANTED as to Count I against Talley for false arrest; 4) denied as to Count II; and 5) GRANTED as to Count IV. A status hearing is set for October 2, 2018 at 9:30 a.m. to discuss trial scheduling and procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Patrick Swenie ("Plaintiff") was photographing the exterior of the municipal building that contains the Maywood (Illinois) Police Department on August 29, 2016. (Dkt. 88 at ¶ 3.) After no more than five minutes, he was approached by Defendant Maywood Chief of Police Valdimir Talley ("Talley"). (*Id.* at ¶ 5.) Prior to exiting the building, Talley was not aware that

Plaintiff was outside the building taking pictures, and nobody had reported to Talley that Plaintiff was outside the building. (*Id.* at ¶ 7.) Talley was walking towards his vehicle when he approached Plaintiff. (*Id*. at ¶ 8.) Plaintiff recorded a video of his interaction with Talley and other members of the Maywood Police Department on that day. (Dkt. 80, Ex. O.) The video shows that Talley approached Plaintiff within 20 seconds of leaving the building, immediately identified himself as "Chief Talley," and inquired whether Plaintiff was aware that the edifice Plaintiff was photographing was a police building. (*Id.*) When Plaintiff did not provide a verbal response to that question, Talley asked Plaintiff to provide identification. (*Id.*; dkt. 88 at ¶ 8.) Talley testified at his deposition that he asked Plaintiff for identification because he appeared to be taking pictures of people entering and exiting the building, as well as the security features of the building. (Dkt. 88 at ¶ 9.) After asking for identification a second time and receiving no verbal response, the video shows Talley telling Plaintiff, "sir, I need you to stop taking pictures right now, and I need you to give me some identification." (Dkt. 80, Ex. O.) Plaintiff responds, "I'm not going to give you I.D." (*Id.*) Talley reiterates that the building is a "governmental facility" and states that he is going to "need to know why" Plaintiff is taking "those pictures" and Plaintiff is "going to have to tell [Talley]." (*Id.*) After once again receiving no verbal response, Talley issues the following ultimatum: "if you don't tell me, it's going to be a disorderly conduct, and I'm going to take you downstairs and I'm going to identify you." (*Id.*) When Plaintiff questions whether he has done something wrong, Talley retorts that Plaintiff has done something wrong – namely, taking pictures of a police facility. (*Id.*) When Plaintiff inquires whether doing so is illegal, Talley tells him "yes, it is." (*Id.*)

At some point, Defendant Commander Theodore Yancy ("Yancy") arrives offscreen. Yancy testified that he was on his way home when Talley waived him over to assist with Plaintiff. (Dkt. 88 at ¶ 23.) After asking Plaintiff for his name twice to no avail, Yancy introduces himself, and asks Plaintiff "how are you doing?" (Dkt. 80, Ex. O.) When Plaintiff fails to respond, Talley can be heard

2

to say "all right, let's go." (*Id.*) When Plaintiff asks whether he is being arrested, Talley says "you are under arrest," and the video shows the Plaintiff walking wordlessly into the Maywood Police Station. As they enter the building, Talley states "you are under arrest for disorderly conduct." (*Id.*)

Once inside the police department, Talley passed Plaintiff to Defendant Sergeant Daryl Fairley ("Fairley") before Talley left a few minutes later. (Dkt. 88 at ¶ 39.) Talley told Fairley his version of events, including that Plaintiff had engaged in disorderly conduct by taking photographs of the building that housed the Maywood Police Department. (*Id.* at ¶ 41.) Fairley testified that he was not present when Talley placed Plaintiff under arrest and did not make the decision to arrest Plaintiff. (*Id.* at ¶¶ 42-43.) Fairley asked Plaintiff to provide his name, and Plaintiff responded by asking Fairley if he was under arrest; Fairley did not initially respond because he believed that Talley had already told Plaintiff that he was under arrest. (*Id.* at ¶ 48.) After repeatedly asking Fairley if he was under arrest, Fairley answered that Plaintiff was, indeed under arrest, and Plaintiff provided his name and identification to Fairley. (*Id.* at ¶ 49.) Fairley issued Plaintiff one citation for "knowingly obstruct[ing] the performance of Chief Talley and Sgt. Fairley of (sic) an authorized act within their official capacity, in that said respondent refused to provide Chief Talley and Sgt. Fairley with his name after multiple requests." (*Id.* at ¶¶ 51-52.) The arrest report similarly states that Plaintiff was arrested for "obstruction." (*Id.* at ¶ 54.)

On January 6, 2017, Plaintiff was scheduled for an administrative hearing on the aforementioned citation; on that date, Fairley issued a second citation to Plaintiff for disorderly conduct, on the basis that Plaintiff "knowing (sic) caused a breach of the peace by photographing officers and civilians going in and out of the police station." (*Id.* at ¶ 58.) At the conclusion of the hearing, Plaintiff was found not liable for the second citation. (*Id.* at ¶ 63.) That citation alleged that Plaintiff had violated municipal ordinance 130.20(A)(1), which states that "making, aiding, or assisting in the making of any improper noise, disturbance, breach of the peace or diversion tending

3

to a breach of the peace" constitutes disorderly conduct. (*Id.*) However, Plaintiff was found liable on the first citation. (*Id.* at ¶ 64.) Specifically, Plaintiff was found to have violated municipal ordinance 130.20(A)(5), which states that "resisting or obstructing the performance of one known to be a police officer or any authorized act within the police officer's official capacity or impersonating a police officer" constitute disorderly conduct. (*Id.*)

Plaintiff then filed the instant suit, bringing causes of action for unreasonable seizure in violation of the Fourth and/or Fourteenth Amendments of the United States Constitution against Talley and Yancy (Count I), unreasonable seizure and failure to intervene in violation of the Fourth and/or Fourteenth Amendments of the United States Constitution against Fairley (Count II), malicious prosecution against Talley, Yancy, Fairley, and the Village of Maywood under Illinois law (Count III); and judicial review of Plaintiff's conviction on the above-referenced ordinance pursuant to the Illinois Administrative Review Act, 735 ILCS 5/3-103 against the Village of Maywood, the Village of Maywood Department of Administrative Hearings, Maywood Ordinance Enforcement Department, Maywood Department of Community Development, Hearing Officer Pamela Harris, Talley, Yancy, and Fairley (Count IV). Defendants were unable to provide a transcript of Plaintiff's administrative hearing because the audio recording was too poor to transcribe, and the audio file the Defendants produced in this case is, in fact, so poor that is impossible to understand the testimony. (*Id.* at ¶¶ 65-66.) Plaintiff has filed for summary judgment on Counts I, II, and IV of his Complaint. That motion has been fully briefed and is ripe for disposition.

## DISCUSSION

I. **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette Indiana*, 359 F.3d 925, 928 (7th Cir. 2004). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Cellotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Cellotex,* 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

## II.     PLAINTIFF'S MOTION IS DENIED AS TO THE *TERRY* STOP.

The Fourth Amendment provides that "the right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Crucially, "'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)). A consensual encounter with a police officer seeking voluntary cooperation through non-coercive interrogation is not a "seizure" within the meaning of the Fourth Amendment, and does not implicate its protections. *Jones v. Clark*, 630 F.3d 677, 682 (7th Cir. 2011). However, "[w]hen an encounter shifts from consensual dialogue to an investigatory stop, the officer must be able to point to specific facts that give rise to a reasonable suspicion that the person stopped is involved in criminal activity." *Id.* at 682-83. "An individual has been seized, only if,

5

considering all of the circumstances, a reasonable person would have believed…that he did not remain at liberty to disregard a police officer's request for information." *Pliska v. City of Stevens Point*, 823 F.2d 1168, 1176 (7th Cir. 1987) (citing *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980)). An individual need not be arrested before the Fourth Amendment's protections to come into play; an investigatory "stop and frisk" (also known as a *Terry* stop) qualifies as a seizure. *Terry*, 392 U.S. at 17. To make a constitutionally valid *Terry* stop, an officer need not have probable cause, but must have a reasonable articulable suspicion that "criminal activity is afoot." *D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (quoting *United States v. Riley*, 493 F.3d 803, 808 (7th Cir. 2007)). A "mere hunch" is not sufficient; the officer "must be able to point to specific facts that suggest that a stopped individual has committed, was committing, or is about to commit an offense." *Id.* The question to be asked in making that determination was articulated by the Supreme Court as follows: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22. "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006).

The first step in the Court's analysis is to determine whether a *Terry* stop occurred, and if so, when it began and ended. Construing the facts in the light most favorable to Defendants and drawing all inferences in their favor – as the Court must do in this procedural posture – the Court does not believe the initial contact between Talley and Plaintiff necessarily qualifies as a *Terry* stop as a matter of law, such that summary judgment would be appropriate. Chief Talley simply approaches the Plaintiff, identifies himself, and asks for identification. A reasonable juror might find that Plaintiff would have reasonably believed he was free to walk away at that time. In the

6

Court's view, that continues to be true until Talley threatened Plaintiff with arrest for disorderly conduct if he did not identify himself. At that point, Talley had presented Plaintiff with two very clear and mutually exclusive options: answer his questions or be arrested. No reasonable person would have believed that they could simply ignore Talley and walk away. This is the moment when Talley's interaction with Plaintiff shifted from a consensual encounter to a detention that triggers the requirements of the Fourth Amendment. Obviously, the *Terry* stop ended when Plaintiff was placed under arrest by Talley, which creates a new set of standards (*i.e.*, probable cause) that will be discussed more fully in the next section of this opinion.

Having established when the *Terry* stop began, the Court must determine whether Talley had an articulable reasonable suspicion that Plaintiff was engaging or about to engage in criminal activity. Talley identified several factors that led him to believe the *Terry* stop was warranted: 1) Plaintiff appeared to be photographing people entering and exiting the building, and the security features of the building; 2) Plaintiff refused to answer simple questions about his identification; 3) Talley's experience on the Joint Terrorism Task Force with the F.B.I. during his tenure with the Illinois State Police (Dkt. 96 at ¶ 16); and 4) "there had been eight multiple shootings where about 20 officers were killed…where the individual that was outside capturing the movements and actions of the police department." (Dkt. 81, Ex. B at 23:7-17.)[1] Again, taking all the facts in the light most favorable to Talley, and drawing all the inferences in his favor, the Court finds that Defendant Talley has adequately articulated a basis for a reasonable suspicion that Plaintiff was engaged in criminal activity. A reasonable juror could find that a police officer with the facts known by Talley and the circumstances surrounding the *Terry* stop at the time it was initiated had a reasonable suspicion that

---

[1] In Talley's deposition, he does not identify when or where these shootings occurred. However, the Defendants have raised the July 2016 shooting of five Dallas police officers in their brief in opposition to the instant motion. *See* Manny Fernandez, Richard Pèrez-Peña, and Jonah Engle Bromwich, *Five Dallas Officers Were Killed as Payback, Police Chief Says*, N.Y. TIMES (July 8, 2016), https://www.nytimes.com/2016/07/09/us/dallas-police-shooting.html.

Plaintiff was engaged in taking photographs of the Maywood Police Department for nefarious, criminal purposes. The Court cannot say as a matter of law that it is unreasonable that, in the climate for police at the time of the incident according to Talley, with Plaintiff's apparently evasive behavior, and Talley's perception that Plaintiff was photographing security features of the building as well as points of ingress and egress, Talley suspected that Plaintiff was surveilling the police department for some future criminal activity – whether it be a shooting or simply "casing" the building for a break-in of some sort. This is not to say that the Court finds that the stop was reasonable, as discussed below. This issue is eminently triable. It requires analyzing whether a reasonable juror could find that a reasonable police officer had a reasonable suspicion. The trier of fact will be uniquely qualified to assess the aforementioned issues, and the Court does not believe it would be appropriate to rob a jury of its most crucial function in this matter. In this procedural posture, the Court cannot say that the undisputed facts demonstrate that Plaintiff's detention was unconstitutional as a matter of law. Therefore, the Court rejects this argument as to Count I.[2]

Plaintiff's arguments to the contrary can be categorized into two distinct types, neither of which is persuasive. First, Plaintiff argues that "none of the facts [Talley] claims to have relied upon would, if considered alone, amount to reasonable suspicion," and then ticks off each of the factors listed above and attempts to explain why they do not support reasonable suspicion. This method fails to properly apply the reasonable suspicion test, which requires the Court to consider the totality of the circumstances, not isolated facts. *See Lawshea*, 461 F.3d at 859. In fact, the Seventh Circuit has stated that "certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to a reasonable suspicion when viewed in the context of other factors at play." *Id.*

---

[2] This portion of the ruling applies with equal force to Yancy.

Second, Plaintiff repeatedly notes that nothing Plaintiff did was illegal on its own, and therefore the *Terry* stop was not justified. This also misstates the law. A suspect need not be doing anything illegal for a police officer to form a reasonable suspicion that would justify a brief investigatory detention. For example, in *Terry* – the seminal case in this area – nothing the defendants did (taking turns walking past a jewelry store several times, looking in the window, conferring with each other after each pass-by, etc.) was illegal *per se*, but the Supreme Court ruled that those actions were sufficient to plant reasonable suspicion in the officer's mind such that the defendants' detention was found to be constitutional, 392 U.S. at 28-29. Therefore, the fact that it is not illegal to take pictures of a building or refuse to give a police officer your name is not sufficient to show, as a matter of law, that the *Terry* stop in this case was not justified.[3]

To be clear, the Court believes this case presents a very close call, and there is a very strong argument that the totality of the circumstances did not provide Talley with reasonable suspicion to detain Plaintiff. If taken to its logical extreme, Defendants' arguments could provide virtual *carte blanche* for the police to stop anyone they believe is looking at a building the wrong way. Sadly, we live in an age where virtually every public gathering place in modern American life – elementary schools, high schools, community colleges, universities, churches and other houses of worship, movie theaters, nightclubs, shopping malls, airports, concert venues, offices, and restaurants – has

---

[3] Similarly, Plaintiff's repeated reliance on *Jones* to stand for the proposition that taking pictures on the street does not support a reasonable suspicion to detain an individual is also misplaced. In that case, the plaintiff was a utility worker who was reading meters and often had to use binoculars to do so when gates or dogs blocked her path to the meters. *Jones*, 630 F.3d at 681. A concerned citizen called the police on the plaintiff, and the police investigated what the plaintiff was doing. *Id.* Immediately, it became clear to the officers that the plaintiff – who was "dressed top to bottom in ComEd gear" – was a utility worker, and the person who had lodged the 911 call confirmed that plaintiff had been reading meters. *Id.* For some reason, this was not enough for the officers, who approached the plaintiff, asked to speak with her (and plaintiff complied with that request), and were presented by plaintiff with two different forms of identification bearing the ComEd logo. *Id.* When the police officers explained that someone had been concerned that plaintiff was taking pictures of houses, plaintiff showed the officers her binoculars and explained their utility in her job reading meters. *Id.* When plaintiff turned to walk away, the officers initiated a *Terry* stop and asked plaintiff for her date of birth. *Id.* Needless to say, the totality of the circumstances in that case – where the plaintiff's lawful purposes were immediately apparent from her uniform and she voluntarily provided information that would plainly dispel any lingering suspicions – is vastly different than the facts presently before the Court.

been subject to a mass shooting. Seemingly, there will always be a similar incident fresh in the mind of police that could potentially justify their suspicion of a person who they believe is approaching a building or public space in a way they deem suspicious. Likewise, the failure to provide identification to a police officer is an extremely weak limb on which to rest one's reasonable suspicion. On its own, simply asserting your constitutional right to go about your day without being harassed by the police and required to provide identification papers should not – and indeed cannot – be the basis for reasonable suspicion. As Justice Douglas sagely and presciently explained in his dissent in *Terry:*

> There have been powerful hydraulic pressures throughout our history that bear heavily on the Court to water down constitutional guarantees and give the police the upper hand. That hydraulic pressure has probably never been greater than it is today. Yet if the individual is no longer to be sovereign, if the police can pick him up whenever they do not like the cut of his jib, if they can "seize" and "search" him in their discretion, we enter a new regime.

*Terry,* 392 U.S. at 39 (Douglas, J., dissenting).[4]

Nonetheless, the constitutional test before the Court requires an examination of the totality of the circumstances, and it is possible that a juror could find that several small, seemingly inconsequential, and otherwise innocuous activities combined to create reasonable suspicion in Talley's mind. Ultimately, this is more appropriately left for a jury to decide, and the Court denies summary judgment as to Count I, to the extent it concerns the *Terry* stop.

### III. PLAINTIFF'S MOTION IS GRANTED ON THE FALSE ARREST CLAIM.

Next, the Court must determine whether Plaintiff's arrest violated the Fourth Amendment. To be constitutional, an arrest must be supported by probable cause. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether that arrest was constitutionally valid depends in turn upon whether, at the

---

[4] The Court notes that Justice Douglas's dissent argued that no search or seizure could be constitutionally valid without probable cause, which is clearly not the state of Fourth Amendment jurisprudence in the 50 years since *Terry* was decided.

moment the arrest was made, the officers had probable cause to make it"). "Probable cause depends on state criminal law, and it exists when a reasonable officer with all the knowledge of the officers on the scene would have believed that the suspect committed an offense defined by state law." *Jones*, 630 F.3d at 684 (internal citations omitted).

In this case, Talley did not have probable cause to arrest Plaintiff on either of the alleged offenses that formed the basis for the citations given to Plaintiff. The only two actions taken by Plaintiff that were identified in those citations was Plaintiff's refusal to provide Talley with identification and taking pictures of the Maywood Police Department. Failing to provide identification during a *Terry* stop is not obstruction or disorderly conduct, and Talley (as the chief of the Maywood Police Department) can objectively be expected to know as much. *See People v. Fernandez*, 963 N.E.2d 1058, 1061 (Ill. App. Ct. 2011) ("Because defendant could not be convicted of obstruction for merely refusing to identify himself and refusing to provide identification, we reverse his conviction [for obstruction]").

Defendants seem to concede this point, as they do not argue anywhere in their briefs that Talley had probable cause to arrest Plaintiff for disorderly conduct or obstructing a police officer. Instead, they argue that Talley had probable cause to arrest Plaintiff based on the Village of Maywood's loitering statute. (Dkt. 89 at 8.) That ordinance makes it unlawful to:

> Loiter or prowl in a place, at a time, or in a manner not usual for law-abiding citizens under circumstances that warrant alarm for the safety of persons or property in the vicinity. Among the circumstances which may be considered in determining whether such alarm is warranted is the fact that the actor takes flight upon the appearance of a peace officer, refuses to identify himself or manifestly endeavors to conceal himself or any object. Unless flight by the actor or other circumstances make an [sic] impracticable, a peace officer shall prior to any arrest for an arrest under this division afford the actor an opportunity to dispel any alarm which would otherwise be warranted.

Maywood Municipal Code § 130.23.

11

Seemingly, Defendants are attempting to use the "closely related charge" defense to Plaintiff's claim for an unconstitutional arrest. "[A]n arrest is justified if the officers had probable cause (or arguable probable cause) to arrest the suspect either for the precise offense the officers cited *or for a closely related charge*." *Williams v. Jaglowski*, 269 F.3d 778, 784 (7th Cir. 2001) (emphasis added). "In order to rely on a closely-related charge, however, the officers must show that the charge can reasonably be based on the same set of facts that gave rise to the arrest and that the charge offered as justification is one that 'would [have recommended] itself to a reasonable police officer acting in good faith' at the time the arrest was made." *Id*. (quoting *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir. 1988)). The question turns on whether a reasonable officer would have believed a legal basis for arrest existed, based on the actual knowledge of the facts of the officer in question. *Richardson*, 860 F.2d at 1431. However, *ex post facto* rationalizations of any crime that might fit within the fact pattern of a given case will not be indulged by courts as a basis for justifying an arrest. *Id*.

The Court does not believe Defendants have adequately demonstrated that they had probable cause to arrest Plaintiff for loitering. First, it is unclear whether a reasonable police officer acting in good faith would have believed that the loitering statute for the Village of Maywood was constitutional according the Illinois Supreme Court. *See City of Chicago v. Morales*, 687 N.E.2d 53, 60 (Ill. 1997) ("Nevertheless, it is well settled that broadly worded criminal loitering laws which prohibit loitering without additional unlawful conduct are doubtlessly unconstitutional), *aff'd*, 527 U.S. 41 (1999). Second, even if the ordinance is not unconstitutionally vague – an issue not before this Court – the facts in this case do not support a reasonable inference that Talley had probable cause to arrest Plaintiff for loitering. "Loiter" is not defined in the ordinance (at least on the record before the Court), but Black's Law Dictionary defines "Loitering" as "[t]he criminal offense of remaining in a certain place (such as a public street) for no apparent reason." *Loitering*, BLACK'S

12

LAW DICTIONARY (10th ed. 2014).[5] There is no indication Talley witnessed Plaintiff "remaining in a certain place." Talley testified that he was not aware Plaintiff was taking pictures before he exited the Maywood Police Department, and the video of the interaction shows that Talley approaches Plaintiff immediately after exiting the building and introduces himself within approximately 20 seconds. (Dkt. 81, Ex. B at 12:5-23, Ex. O.) In other words, Talley had no reason to believe Plaintiff was remaining in that location, as opposed to snapping a few pictures of the building and moving on. Moreover, Talley did not believe Plaintiff was not standing on the sidewalk for "no apparent reason." Rather, he believed Plaintiff was taking pictures of the Maywood Police Department, including the security features of the building. In short, the facts as Talley knew them at the time he arrested Plaintiff would not have led an objectively reasonable police officer acting in good faith to believe that the officer could arrest Plaintiff under loitering ordinance cited above.[6] Instead, this justification strikes the Court as an *ex post facto* rationalization, particularly since the Defendants had several months between his arrest and his administrative hearing and failed to issue a loitering citation, despite serving him with a second citation for an additional violation shortly before said hearing.

However, the Court does not believe that it can grant summary judgment on the false arrest claim against Yancy. As discussed more fully in the next section of this opinion, an individual must either cause or participate in an allegedly false arrest to be liable pursuant to 42 U.S.C. § 1983. *See* Section IV, *infra*. According to Yancy, he did not assist in Plaintiff's arrest and Talley made the decision to arrest Plaintiff. (Dkt. 81, Ex. F at 77:20-8:3.) Talley corroborated this statement,

---

[5] The definition also notes that "[l]oitering statutes are generally held to be unconstitutionally vague." *Loitering*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[6] Similarly, Talley could not have reasonably believed that Plaintiff was "prowling." That term is also not defined in the statute, but the Merriam-Webster dictionary defines "prowl" as "to move about or wander stealthily in or as if in search of prey." Merriam-Webster, https://www.merriam-webster.com/dictionary/prowl. Standing on a public sidewalk in broad daylight taking pictures cannot reasonably considered to be moving about or wandering "stealthily."

testifying that Talley arrested Plaintiff by himself and that Yancy did not touch Plaintiff in any way during the arrest. (Dkt. 81, Ex. B at 19:4-23.) The video also shows that Yancy had very little interaction with Plaintiff before Talley placed him under arrest and does not show that Yancy participated in the arrest in any way. (Dkt. 81, Ex. O.) Although Yancy may have assisted with transporting Plaintiff from the sidewalk into the building housing the Maywood Police Department (Yancy's voice can be heard in the video after Talley brings Plaintiff to Fairley for processing), that alone does not necessarily mean that Yancy would be liable for false arrest. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1000-01 (7th Cir. 2003) (sheriff transporting arrestee to station not sufficient for liability for false arrest). As such, on the record before us, the Court cannot say that Yancy sufficiently participated in the false arrest to make him liable as a matter of law. That issue will need to be brought before the jury.

As such, the Court grants the Plaintiff's motion for summary judgment on Count I on the claim for false arrest as to Talley only. However, because Count I of Plaintiff's complaint combines the *Terry* stop and the arrest into one cause of action, it is unclear to this Court whether the liability for the *Terry* stop needs to be tried. It seems to the Court that any damages from the *Terry* stop would necessarily be subsumed into the unconstitutional arrest of the Plaintiff, but that issue has not been addressed by the parties. The Court will discuss that issue at its next status hearing on October 2, 2018 at 9:30 a.m., at which time the Court will determine whether additional briefing on that issue is required and set a trial schedule for the remaining claims.

## IV. SUMMARY JUDGMENT IS DENIED AS TO FAIRLEY ON COUNT II.

The Court does not believe summary judgment is appropriate as to Fairley on Count II. "'An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.'" *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)) (emphasis in original). Where the constitutional

violation being alleged is false arrest, the deprivation takes place when the arrestee is seized and a reasonable person would not have believed he or she was free to leave; therefore, in order to have "caused" or "participated" in an arrest, the individual in question "must have undertaken some action prior to, or perhaps at the time of" the arrest. *Id.* at 583-84; *see also Long v. McDermott*, 2004 WL 1088351, at *2 (N.D. Ill. May 13, 2004) (plaintiff's "alleged constitutional deprivations in regard to a false arrest claim would have occurred the moment he was taken into custody"). Simply taking action after a seizure has been made – such as transporting an arrestee to the police station, filling out arrest paperwork, or signing a criminal complaint – is not sufficient to imbue an individual with liability for false arrest. *Id* at 584; *see also Morfin* 349 F.3d at 1000-01; *Long*, 2004 WL 1088351, at *2 ("assisting with transport" and "assisting with paper work pertaining to" arrest do not qualify as participating in arrest).

In this matter, a reasonable jury could find that Fairley did not participate in or cause Plaintiff's arrest. Construing the facts in the light most favorable to Fairley, it would be reasonable to find that Plaintiff's constitutional deprivation occurred at the moment he was arrested by Talley outside the Maywood Police Department, and that Fairley's role was limited to simple post-arrest ministerial work that would not rise to the level of liability for false arrest. As such, the Court cannot say that Plaintiff is entitled to summary judgment against Fairley on his false arrest claim.

Similarly, Plaintiff's claim for failure to intervene against Fairley is not appropriate for summary judgment. The duty to intervene arises when an officer "observes or has reason to know that a constitutional violation is being committed *and possesses a realistic opportunity to prevent the harm from occurring*." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis added). As noted above, the constitutional violation for false arrest occurred when Talley told Plaintiff he was under arrest outside of the Maywood Police Department, and then led him into the building and down the stairs for Fairley to process. It is certainly a reasonable inference that Fairley lacked a

realistic opportunity to prevent Plaintiff's false arrest when he was not on location at the time the arrest occurred. Therefore, the Court denies Plaintiff's motion for summary judgment on his claim for failure to intervene against Fairley.

## V. ADMINISTRATIVE REVIEW ACT

In Count IV, Plaintiff seeks to have this Court reverse the decision of the administrative hearing officer finding Plaintiff liable for disorderly conduct for "resisting or obstructing the performance of one known to be a police officer or any authorized act within the police officer's official capacity or impersonating a police officer." In his brief in support of the instant motion, Plaintiff maintains that the Illinois Administrative Review Act, 735 ILCS 5/3-101 *et. seq.*, permits the Court to reverse the agency's decision because Defendants failed to provide an audible audio recording or a transcript of the administrative hearing. The Administrative Review Act vests jurisdiction in state circuit courts (and by extension, this Court exercising supplemental jurisdiction over Count IV) to review final administrative decisions. 735 ILCS 5/3-104. The act further states that the defendant's answer "shall consist of the original or a certified copy of the entire record of proceedings under review, including any such evidence as may have been heard by it and the findings and decisions made by it." 735 ILCS 5/3-108(b). The Court is given broad power in entering orders on review, including the ability to "affirm or reverse the decision in whole or in part." 735 ILCS 5/3-111(a)(5). However, "[t]echnical errors in the proceedings before the administrative agency or its failure to observe the technical rules of evidence shall not constitute grounds for the reversal of the administrative decision unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him or her." 735 ILCS 5/3-111(b).

The appropriate remedy for a failure to file the required transcript and evidence from the administrative hearing was established by the Illinois Supreme Court in *Strohl v. Macon Cty. Zoning*

16

*Bd. of Appeals*, 104 N.E.2d 559 (Ill. 1952). In that case, the owners of a grocery store and meat market appealed the denial of their rezoning request by the Macon Country Zoning Board to the Circuit Court of Macon County. *Id.* at 560. However, the defendants failed to provide any "record of the administrative proceedings, a statement of the decision appealed from, or a transcript or stipulation of the evidence upon which the administrative decision was based, if such was the case." *Id.* at 563. Despite this lack of a record, the trial court decided to conduct a trial *de novo* and hear new evidence, before reversing the decision of the zoning board. *Id.* That decision was appealed, and the appellate court noted that the trial court's actions were clearly outside the scope of review dictated by the Administrative Review Act, which limits the review to the questions of facts and law presented to the administrative agency and prohibits the court from hearing or entertaining new evidence. *Id*. at 562-63. The appellate court held that "[w]hether or not the Macon County Zoning Board of Appeals made findings and conclusions on questions of fact in the present case cannot be judicially determined, for no record of the administrative proceeding or of the decision to be reviewed was ever brought before the circuit court." *Id.* at 563-64. Therefore, the appellate court remanded the case to the circuit court with the following instructions:

> The decree of the circuit court of Macon County is therefore reversed and set aside and the cause is remande [sic] to that court to determine if a record of administrative proceeding was kept. *If it is determined that none was kept, it is directed that the decision of the Board of Appeals be reversed*, whereas if it be determined that the record exists, it is directed that the cause be remanded to the board with directions to complete and file it in this cause, and that judicial review in the manner contemplated by the Administrative Review Act be completed.

*Id*. at 565 (emphasis added).

In this case, the failure to provide either a transcript or a record of the administrative hearing likewise robs this Court of the ability to provide meaningful judicial review of the administrative decision finding Plaintiff liable for disorderly conduct. Defendants have failed to provide this Court

17

with the evidence heard by the relevant administrative agency. As per *Strohl*, where an administrative agency has failed to maintain an appropriate administrative record preserving the findings of fact and conclusions of law, if any, made by the agency and the evidence on which such decision is based, the appropriate remedy is to reverse the decision of that administrative agency.[7] Therefore, the Court grants summary judgment in favor of Plaintiff on Count IV, and reverses the administrative finding that Plaintiff was liable for disorderly conduct and fining him $150.00 for the same.

## CONCLUSION

For the reasons discussed herein, Plaintiff's Motion for Summary Judgment (dkt. 78) is granted in part and denied in part as follow: 1) DENIED as to Count I against Yancy and Talley to the extent Count I concerns the investigative *Terry* stop of Plaintiff; 2) DENIED as to Count I against Yancy for false arrest; 3) GRANTED as to Count I against Talley for false arrest; 4) denied as to Count II; and 5) GRANTED as to Count IV. A status hearing is set for October 2, 2018 at 9:30 a.m. to discuss trial scheduling and procedure.

**ENTERED: 9/27/18**

_____
**U.S. Magistrate Judge, Susan E. Cox**

---

[7] Defendants attempt to distinguish *Strohl* by arguing that they had attempted to create a recording of the proceedings, whereas the zoning board in *Strohl* was "negligent in failing to create of the proceedings." (Dkt. 89 at 14.) This is a distinction without a difference. Regardless of whether Defendants negligently failed to attempt a recording or negligently failed to complete an adequate recording, the result is still the same – the Court is incapable of performing a judicial review of the administrative proceeding because Defendants failed to file what is plainly required of them under the Administrative Review Act. As per *Strohl*, the result of this failure is clear, and the Court must reverse the decision of the agency. Moreover, to the extent that Defendants' failure can be fairly characterized as a "technical error," the Court believes that the failure "materially affected" Plaintiff's rights by preventing him from mounting an appeal against the findings as contemplated by the Administrative Review Act, and the Court is permitted to reverse the administrative decision on this basis. *See* 735 ILCS 5/3/-111(b).